---

## THE Z R—3.

(District Court, W. D. Washington, N. D. January 15, 1927.)

No. 10297.

**1. Seamen ⟜2—"Seaman" includes all persons employed in vessel to assist main purpose of voyage.**

"Seaman," by modern definition, includes all persons employed in a vessel to assist in the main purpose of the voyage.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaman.]

**2. Seamen ⟜17—New agreement to pay increased compensation for services under contract, made under circumstances amounting to coercion, held without consideration.**

Libelants made a written contract in Seattle to pack fish on board a fishing vessel in Alaskan waters during the season at a stated price per barrel. When the vessel was on the fishing grounds, and there was a heavy run of fish, libelants refused to work longer unless given increased pay, which was granted. *Held* that, under the circumstances, there was no waiver of their breach of contract, and that the new agreement was without consideration and not enforceable.

**3. Master and servant ⟜72½—Contract of employment held not to require employer to pay return transportation for employees from Alaska.**

An employer of persons to pack fish on a fishing vessel in Alaskan waters, who agreed to furnish transportation from Seattle and return, provided they stayed and rendered satisfactory services during the season, *held* not under obligation to pay their return fare, where they elected to quit before the end of the season.

In Admiralty. Suit by W. Stratton and others against the motorship Z R–3. Decree for respondent.

On the 3d day of June, 1925, Einstoss, owner of the respondent ship, entered into a contract with the libelants, separately, to engage in the packing of fish at a stipulated price "per packed barrel and board for gibbing and packing"—Cowie, 75 cents for the first 5,000 and $1 for the second 5,000 barrels, 50 cents per hour for repacking, and board; Mr. and Mrs. Stratton, 50 cents per packed barrel, and board; McKay, an oral agreement under the same terms as Cowie. The respondent agreed "to furnish

transportation to and from the plant, on their own boat or boats, or by the regular steamer, as decided by the company, provided the [employee] remains with the company for the entire season, and performs his work in a satisfactory manner. If for any reason the [employee] does not remain with the company for the entire season, or because of being discharged for neglect of duty, the amount paid for transportation for the said employee from Seattle to Alaska shall be deducted from wages, and no allowance made for return passage, except in case of illness." The work to be and was done on board ship. Cowie and McKay were experienced packers; Strattons were not.

After packing a number of barrels, Mr. and Mrs. Stratton, and others of similar status, approached the superintendent and requested a modification of their agreement, so that they would receive the same compensation as the parties who were doing like work (75 cents and $1), and declined to work unless modified. The superintendent testified the fish were running well, that he had a number of fish on hand, that he told them these fish would have to be packed, and for them to go to work and he would wire to Einstoss. Einstoss answered, declining the modification, and the fishermen declined to work. The superintendent wired to Einstoss such fact, and received an answer for him to use his judgment. He thereupon called the fishermen together and read them the telegram, told them they would receive the same compensation (75 cents and $1), and the work was continued until September, when, for the lack of fish, operation at that point was discontinued, and a message from Einstoss directed that all but 11 of the fishermen be returned to Seattle, and the remaining moved to another location. Upon that being announced, all but 5 or 6 asked permission to be returned to Seattle. Permission was granted, and Capt. Knutsen employed other men to take their places. The employees asked that their transportation be furnished, and the company stated they would have to pay their own return fare. The fishing ship did not return until December. The fishing season in the Alaskan waters did not close in September. Upon being advised that the company would arrange for the transportation, but would deduct it from the wages due, request was made that the best arrangement possible be made. Transportation for the Strattons and Cowie was arranged for at $67 each; Mc-Kay's, at $75. A statement was given to each party.

Statement given to Mr. and Mrs. Stratton:

|  | Cr. | Dr. |
|---|---|---|
| 92 barrels 60 cents per barrel | $ 55.20 | |
| 531 barrels 75 cents per barrel | 398.25 | |
| 436 barrels $1 per barrel..... | 436.00 | |
| Repack, 92½ hours, 50 cents per hour ................. | 46.25 | |
| Longshore, 10 hours, 50 cents per hour ................. | 5.00 | |
|  | $940.70 | |
| Slop chest ........................ | | $ 28.20 |
| School tax ......................... | | 5.00 |
| By cash ........................... | | 200.00 |
|  | | $233.20 |
| Balance due ............... | $707.50 | |
| Less steamship fare......... | 134.00 | |
|  | $573.50 | |

[Signed] Harold P. Knutsen.

The claim made by McKay and Cowie is for transportation only.

Geo. F. Vanderveer and S. B. Bassett, both of Seattle, Wash., for libelants.

Roberts & Skeel, Elwood Hutcheson, and O. R. Holcomb, all of Seattle, Wash., for respondent.

NETERER, District Judge (after stating the facts as above). Respondent contends a lien against the vessel may not be asserted, that the service is a landsman's service, and that the agreement to pay 75 cents and $1, instead of 60 cents, is without consideration.

Section 8149, Comp. St. (section 4393, R. S.), having relation to recovery of shares of fish under agreement, has no application to this issue, as contended for by the libelants. The libelants did not work on a "fisherman's share" of the fish, but for a stipulated wage.

[1] Section 8392, Comp. St., however, has application: "Every person * * * who shall be employed or engaged to serve in any capacity on board the same [vessel] shall be deemed and taken to be a seaman. * * *"

As presently employed, a seaman is not a mariner in the full sense of the word—a person "who can hand, reef, and steer." Changing conditions, and necessities for changes, extended the term to include all persons employed in a vessel to assist in the main purpose of the voyage. Clearly, the main purpose of the voyage was to pack and salt fish. See The Minna (D. C.) 11 F. 759; The Sea Lark (D. C.) 14 F.(2d) 201.

[2] Mr. and Mrs. Stratton, the parties to

this action, as observed, were under written contract for stated compensation to render their services in the fishing grounds of the Alaskan waters. After entering upon the contract in these remote waters, they declined to work unless given an increased compensation. There was no consideration for a modification of the contract; there was no change in conditions or character of the service; there was no intervening agency which in any sense changed the relation between the work contracted to be done and the work which was actually done. The contention that the respondent voluntarily waived his right under the contract, and entered into a new contract at the agreed compensation, is not warranted by the testimony in the case. The vessel, with the packing paraphernalia on board, was out on the fishing grounds in the waters of the Pacific Ocean. The fish were running heavy. It was necessary that they be taken care of. The libelants declined to work, and it was this condition which forced the consent to pay the increased wage, and under all of the circumstances it may not be said that this was a voluntary waiver. See Alaska Packers' Ass'n v. Domenico (C. C. A.) 117 F. 99, at page 102.

In that case the libelants entered into a written contract to go to Pyramid Harbor, Alaska, during the fishing season, at a stipulated wage, for the season. A few days after arriving at Pyramid Harbor, the employees demanded of the company's superintendent an increase, and, unless paid, they would not work. The demand was granted. Judge Ross, for the court, said:

"From the foregoing statement of the case, it will have been seen that the libelants agreed in writing, for certain stated compensation, to render their services to the appellant in remote waters where the season for conducting fishing operations is extremely short, and in which enterprise the appellant had a large amount of money invested; and, after having entered upon the discharge of their contract, and at a time when it was impossible for the appellant to secure other men in their places, the libelants, without any valid cause, absolutely refused to continue the services they were under contract to perform unless the appellant would consent to pay them more money. Consent to such a demand, under such circumstances, if given, was, in our opinion without consideration, for the reason that it was based solely upon the libelants' agreement to render the exact services, and none

other, that they were already under contract to render. The case shows that they willfully and arbitrarily broke that obligation. As a matter of course, they were liable to the appellant in damages, and it is quite probable, as suggested by the court below in its opinion, that they may have been unable to respond in damages. * * * Certainly, it cannot be justly held, upon the record in this case, that there was any voluntary waiver on the part of the appellant of the breach of the original contract."

The plain fact is that the libelants refused to perform their contract, and coerced a promise from the superintendent to pay an increased compensation for doing what they were legally bound to do. It would be gross injustice to hold that, under such conditions, parties could enter into a written contract at Seattle, be carried to the fishing grounds in the North Pacific Alaskan waters at large expense by persons engaged in the enterprise, and then quit work unless their demand is granted for increased compensation—at a time when there was overabundance of fish, and other help not available—and then recover the increased demand.

While in the Alaska Packers' Ass'n v. Domenico Case, supra, there was a question of authority to grant the increase, which is not present in this case, the court in its decision assumed that there was authority, in employing the language set out. The case of Heino v. Libby, McNeill & Libby, 116 Wash. 148, 205 P. 854, is likewise cited by the respondent. While the relations in that case are not analogous, the sentiment of the court is in harmony with the expression in Alaska Packers' Ass'n v. Domenico, supra.

Much capital is invested and many men are employed during the fishing season upon the fishing grounds in the Pacific Ocean adjacent to the United States and Alaska, and the rule announced in Alaska Packers' Ass'n v. Domenico, supra, is wholesome in its operative effect, and affords a basis of safety for investment in, and conduct of, fishing enterprises in these remote zones.

[3] As to the return transportation charges: That was disposed of by the agreement of the parties. The direction was to return all but 11. There were 15 or 18 persons employed, and all but 5 or 6 desired to return, and, when advised that the respondent would not pay for the transportation, the parties could have remained; they were not discharged. It was their election; they elected to return and pay their fare, and this was included in the statement which was given

them. Having elected to return and pay their fare, they may not recover under the terms of their contract. Had they not requested to be permitted to return, and been discharged, their status would be otherwise.

Libel dismissed.